# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY

ON APPEAL FROM THE COURT OF CHANCERY,
AND THE PREROGATIVE COURT.

### NOVEMBER TERM, 1907.

PHINEAS B. MARR, appellant,

*v.*

WILLIAM A. MARR et al., respondents.

[Argued December 13th, 1907.  Decided June 15th, 1908.]

1. As a general rule, if a trustee becomes the purchaser of the trust property, such purchase is voidable at the instance of the *cestui que trust.*

2. This rule applies notwithstanding the trustee purchase at a public sale.

3. The director of a corporation occupies a position of trust or agency for his company of such a character that dealings between him and the company, where his interest is opposed to that of the company, will be subject to close scrutiny and not sustained against the stockholders unless consistent with good faith and fair dealing on the part of the director.

643

4. A director, who is at the same time a creditor of his corporation, may, for the purpose of collecting his debt, assume a position antagonistic to his company and its stockholders by bringing action and proceeding to judgment and execution for the recovery of the debt.

5. But a director, who is also creditor of his company, must, on taking legal proceedings for collection of his debt, relinquish his trust *pro hac vice*, not covertly, but openly, and with fair notice to his company. Whether such notice should be given to the stockholders or to the directors may depend on circumstances.

6. Under the circumstances of the present case—*Held*, that the defendant director, who purchased at sheriff's sale all the property of the company under executions issued at his suit, and for a consideration not exceeding one-half the value of the property, took the title subject to an option on the part of his *cestui que trust* to have the benefit of the purchase.

7. Relief, under the circumstances, granted to a single stockholder who by reason of infancy was not chargeable with laches, notwithstanding that the other stockholders might be debarred on the ground of their acquiescence or laches.

On appeal from a decree of the former chancellor, advised by Vice-Chancellor Leaming, whose opinion is reported in *72 N. J. Eq. (2 Buch.) 797.*

*Messrs. Bleakly & Stockwell,* for the appellant.

*Mr. Thomas B. Hall* and *Mr. Dwight M. Lowrey* (of the Philadelphia bar), for the respondents.

The opinion of the court was delivered by

PITNEY, CHANCELLOR.

The bill of complaint herein is in form a bill filed by the complainant as a stockholder of the Beacon Land Company, in behalf of himself and other stockholders, for the purpose of either setting aside certain sheriff's sales of the real estate and personal property of the company made to the defendant William A. Marr under executions issued upon a judgment held by the latter against the company, or else to impress a trust upon his title in favor of the complainant and other stockholders. William A. Marr and the Beacon Land Company were named as defendants. It appears, however, by the averments of the bill,

that in the year 1902, and long prior to the commencement of this suit, the charter of the company was forfeited by reason of its failure to pay the state taxes assessed against it. *P. L. 1902 p. 836.* This fact was admitted at the hearing. It further appears from the answer of William A. Marr that there is no acting board of directors of the land company, and that from the time of the sheriff's sales in question, which took place in November and December, 1898, the organization of the company has been abandoned. Therefore the bill is in effect filed for the benefit of the complainant and other stockholders as upon a liquidation of the company.

It is argued that since, under sections 53 and 54 of the General Corporation act (*P. L. 1896 p. 295*), a corporation, when dissolved, is continued for the purpose of winding up its affairs and dividing its capital, and the directors are made trustees for the purposes of the winding up, it was incumbent upon the complainant to notify the board of directors of his claim and request them to take action in the matter. No such application having been made, it is insisted, upon the authority of *Siegman* v. *Maloney, 65 N. J. Eq. (20 Dick.) 372,* that his action cannot be maintained. If this objection had been interposed by demurrer to the bill (as was done in *Siegman* v. *Maloney*), or otherwise before the hearing of the cause upon its merits, it might have required consideration. Since the case, however, has been fully heard upon the merits, no good purpose would now be accomplished by turning the complainant about and requiring him to ask the board of directors to do for him that which he has been able to do for himself, viz., produce the evidence necessary for a determination of his case upon the merits. It should be observed, also, that the point that the board of directors ought to be entrusted with control of the litigation is not raised by or in behalf of the corporation.

The bill was dismissed on the ground that the complainant had no equity. We will, therefore, upon this appeal, pass upon the merits.

The facts that give rise to the controversy are briefly as follows: The Beacon Land Company was incorporated in the year 1892 for the purpose of acquiring and operating a seaside

hotel at Point Pleasant, in Ocean county. The company was a sort of "close corporation," the principal stockholders being at the outset James H. Marr (father of the complainant), and his brothers, William A. Marr and George A. Marr, together with a personal friend of theirs, a physician by profession, named Mc-Williams. The outstanding capital stock (all of which was fully paid, so far as appears), amounted to $24,000 in par value, divided into forty-eight shares of $500 each, of which James H. Marr held twenty-one, William A. Marr ten, George A. Marr three, Dr. McWilliams ten, J. W. Felty three, Charles Lewis one and Mrs. Helen M. Crawford (a sister of the Marrs) one share. The directors at the beginning were William A. Marr, James H. Marr, George A. Marr and Dr. McWilliams (all residents of Pennsylvania), and Mr. Lewis, who resided at Asbury Park, in this state. William A. Marr was, from the beginning and at all times, the president. James H. Marr (father of the complainant) died in the year 1895, whereupon his sister, Mrs. Crawford, was elected a director in his stead. Upon the settlement of his estate, fourteen of his shares passed to a Philadelphia trust company, as guardian of the complainant, the latter being then but eleven years of age, and seven shares passed to Rebecca G. Marr, widow of the deceased and mother of the complainant. Except as mentioned, there appears to have been no change at any time in the stockholding interest, nor in the personnel of the board of directors.

At the death of James H. Marr the company was somewhat in debt, and during the next two years the indebtedness was considerably increased, either because the operations of the hotel were unprofitable or because the profits were expended in improvements upon the property. Both before and after the death of James H. Marr, the defendant William A. Marr had advanced to the company considerable sums of money from time to time, and by the close of the year 1897 he had become its sole creditor. In the year 1896 Rebecca G. Marr sued the company in the supreme court of this state and recovered a judgment for $2,057 and costs, and, upon her pressing for payment, William A. Marr paid to her the amount of the judgment and costs and took an assignment thereof in January, 1897. At the same time

.the company owed him other moneys, aggregating upwards of $8,500, besides interest. In the month of September, 1898, he brought action against the company in the supreme court upon this claim, and recovered judgment a month later for $10,287.90, besides costs. Upon execution issued upon this judgment he caused the entire visible assets of the company (and the whole assets, so far as appears), to be sold by the sheriff and became himself the purchaser. The real estate was struck off to him at the price of $3,000 and the personal property at the price of $850. There was no advertisement beyond such as is required by the statute, and there were no bidders in attendance at either sale besides William A. Marr. So far as the amount of the purchase price is concerned, we agree with the learned vice-chancellor that, since the corporation had no other assets, the bids are to be deemed, as between William A. Marr and the company, as in effect equivalent to the aggregate amount due upon the two judgments held by him, which, with interest, amounted to approximately $12,500.

It was deliberately admitted at the hearing, and is therefore beyond controversy upon this appeal, that the property, real and personal, at the time of the sheriff's sales, was fairly worth $25,000.

The complainant and appellant claims that, under the circumstances existing at the time of the sale, William A. Marr was a trustee for the stockholders of the company, and obliged either to protect their interest by preventing a sale, or to give them fair notice that the execution sale was in contemplation, so that they might take measures for their own protection; and that since such notice was not given, and since William A. Marr bought in the property at much less than its value, he must be deemed to have purchased, as a trustee, for his stockholders. The learned vice-chancellor entertained the view that the complainant was not entitled to relief, because, although no notice of the sale was given to the several stockholders other than the statutory notice, it would have been futile to give such notice, and that since defendant Marr had at a previous time earnestly tried to get the stockholders to interest themselves in raising the money due to him, and had found this impossible, he

was warranted in putting his claim into judgment and bringing· the property to sale without further notice to them.

The bill of complaint charges that some of the promissory notes upon which William A. Marr's judgment against the company was based were paid and satisfied before suit brought, and that the remaining notes were without consideration and fraudulently made by the defendant, as president, to himself. It is proper to say that the proofs wholly fail to support these allegations, and, on the contrary, affirmatively show that both the assigned judgment of Rebecca G. Marr and the judgment recovered by William A. Marr himself were based upon honest indebtednesses of the company owing for moneys advanced to it in order to enable it to carry on its proper business.

Nor do the proofs, as we think, support the charge that there was intentional fraud on the part of William A. Marr about bringing the property of the company to sale under his judgments.

It remains to be considered whether, under the circumstances obtaining at the time, and in view of the defendant's trust relation to his stockholders, and the fact that neither the directors nor the stockholders had notice of the sale, the defendant must be deemed to have taken title as trustee for his stockholders.

The learned vice-chancellor, of course, recognized the general principle of equity, that if a trustee becomes the purchaser of the trust property, such act is voidable at the instance of the *cestui que trust*. In *Staats* v. *Bergen, 17 N. J. Eq. (2 C. E. Gr.) 554, 559,* this principle was applied by this court in a case where the property sold did not belong to the *cestui que trust*. The property consisted of certain real estate subject to several mortgages, the second of which was held by the trustee, and the purchase was made by him at a public sale under foreclosure of the first mortgage. In that case it was expressly laid down in the court of chancery (*Staats* v. *Bergen, 17 N. J. Eq. (2 C. E. Gr.) 297, 307*), that the rule that where a trustee or any person as agent for others buys the trust property, the *cestui que trust* is entitled, as a matter of course, to an election whether to acquiesce in the sale or to have the property again exposed for

sale, applies, notwithstanding the sale to the trustee was made at public auction, *bona fide* or for a fair price. This statement of the rule was taken for granted in this court. *17 N. J. Eq.* (*2 C. E. Gr.*) *557, 558.*

Another decision of this court to the same effect is *Marshall* v. *Carson, 38 N. J. Eq.* (*11 Stew.*) *250,* where Mr. Justice Knapp said (at *p. 252*) : "The rule that one clothed in a fiduciary character cannot, either directly or indirectly, become the purchaser of the trust property at his own sale and hold such property against the dissent of the *cestui que trust,* is of such universal prevalence and so grounded in the demands of public policy that no one ventures to question its existence or seeks now to overthrow it. * * * It (the rule) recognizes the difficulty, if not impossibility, of tracing actual fraud in every case, and the frequent failure of justice and success of wrong that must be consequent thereon, and it attempts to apply a method that will remove all temptation from the mind of the trustee to profit by infidelity in the discharge of trust duties of every sort, and which will remove all inducement to act otherwise than faithfully toward the beneficiary, by utterly refusing to consider the question of good or bad faith, and holding the trustee who attempts to deal with the trust property as an individual to all the chances of loss and denying to him all possible gain. This rule, although perhaps most frequently found applied in the decided cases where the existing fact is a sale by or under the direction of the trustee, is by no means limited to that circumstance, as reference to decided cases will show."

But how far is the rule modified when the trust or agency arises out of the fact that one is president or director of a corporation, and he at the same time is a creditor of the company, and the company's property is brought to judicial sale for the purpose of satisfying such debt?

It is settled that a director has not complete freedom to contract with his corporation. In *Stewart* v. *Lehigh Valley Railroad Co., 38 N. J. Law* (*9 Vr.*) *505, 522,* Justice Dixon, speaking for this court, said: "After an examination of all the cases cited, and such others as I have found, and a careful consideration of the principle and the results of regarding it and

of disregarding it, I have come to the conviction that the true legal rule is that such a contract is not void, but voidable, to be avoided at the option of the *cestui que trust* exercised within a reasonable time. I can see no further safe modification or relaxation of the principle than this. A director of a corporation may have rights not arising out of express contract—such as the right to pass over its railroad, or to transport his goods over its canal, on paying reasonable tolls, or to have money which he had loaned it repaid to him; but where the right is one which must stand, if at all, upon an express contract, and which does not arise by operation or implication of law, then he shall not hold it against the will of his *cestui que trust;* for in the very bargain which gave rise to it, in which he should have kept in view the interest of that *cestui que trust,* there intervened before his eyes the opposing interest of himself." See, also, *Gardner* v. *Butler, 30 N. J. Eq. (3 Stew.) 702, 721.*

We cite the last two cases because they show that a director occupies a position of trust, or agency, for his company of such a character that all dealings between him and the company, where his interest is opposed to that of the company, will be regarded with jealousy and suspicion and subjected to the closest scrutiny, and not sustained against the stockholders unless they are consistent with the utmost good faith and fair dealing on the part of the director.

Conceding, as we do, that a director may, under such circumstances as are presented in the case before us, become a creditor of his corporation, it follows *ex necessitate* that he may, for the purpose of collecting his debt, assume a position antagonistic to his company and its stockholders. He may, undoubtedly, bring action against the company and proceed to judgment and execution for the recovery of his debt.

But we deem it clear that the director, who is also creditor, must, on taking legal proceedings for collection of his debt, relinquish his trust *pro hac vice,* not covertly, but openly, and with fair notice to his company. Whether such notice should be given to the stockholders or to the directors may depend upon circumstances. If the company is equipped with other officers

and directors who are actively representing the interests of the stockholders, it may well be that notice to such officers or directors would be deemed sufficient. But it is, as we think, inconsistent with the duty of a director (at least under circumstances such as are here presented) that he should assume an attitude antagonistic to his company, unless he sees to it that the interests of the stockholders, which he, by reason of his personal interest, is for the time disqualified from protecting, are in the charge of other officers and directors able and willing to protect them, and to whom his notice may be given, or else sees to it that fair notice of his contemplated action is given to the stockholders, so that they may take measures to protect themselves.

In the present case it appears, as already mentioned, that the defendant Marr was the sole creditor, so that the only other interest in the company was that of the stockholders, who were few in number and easily reached. It appears that the board of directors had practically ceased to act in the affairs of the company, their last meeting having been held in July of 1897; and no meeting having been called after that date, nor any new board of directors chosen. It appears that the defendant Marr was not only the president, but was practically in sole charge of the current business of the company during the year 1897, and also during the year 1898.

In the year 1897 the financial difficulties of the company became serious. What was done at the last meeting of the board of directors does not appear. A meeting of the stockholders was held in Philadelphia on December 29th, 1897, at which the defendant Marr, George A. Marr, Mrs. Crawford and Dr. Felty were present, and also a Mr. Glenn, who was the trust officer of the trust company that was guardian of the complainant. Mr. Glenn was at the same time acting as attorney for Mrs. Rebecca G. Marr, the mother of the complainant, who was herself a stockholder. At this meeting Mrs. Marr's judgment against the company and the assignment thereof to William A. Marr were reported and spread upon the minutes as a debt due to William A. Marr. The other indebtednesses due to William A. Marr were likewise mentioned and recognized. Another

meeting of the stockholders was held in Philadelphia on February 16th, 1898, at which William A. Marr, Dr. McWilliams, Mrs. Crawford, George A. Marr and Mr. Glenn were present. After a general discussion of the indebtedness of the company and of its prospects, Mr. George A. Marr and Mr. Glenn were appointed a committee to make arrangements with an auctioneer for the sale of the property. This sale was appointed to be held in Philadelphia on a date in April. An upset price of $18,000 was agreed upon by the committee, but no bid was received for an amount approaching that sum. At the two stockholders' meetings just mentioned, William A. Marr stated to Glenn and to the others present that, unless a sale of the property of the company could be effected, defendant would put his claims into judgment and sell the property. It appears, indeed, that none of the stockholders was at this time willing to come forward to contribute towards the payment of the debts. But Mr. Glenn had no information respecting the prospects of the company or the value of its property except that which he received from William A. Marr, and this information gave him the impression that there was no equity in the property over and above William A. Marr's claims.

The hotel was operated by the company during the summer of 1898, and reports of its operations were made to the defendant Marr, as president, who advanced small sums to Mrs. Crawford, the manager, for expenses during that season. The defendant made no report to the stockholders or directors of the operations of the hotel for the season, and called no meeting of stockholders or directors after February, 1898. The indifference of the directors to the concerns of the company seems to have been his reason for pursuing this course; at least, that is the reason that is most favorable to him.

In September, as already mentioned, he brought his action, without notice to anybody representing the company, except, as it may be inferred, that some agent of the company received service of the process; in October he recovered the judgment and in November brought on the property for sale—all without notice to anybody concerned.

Directors' meetings having been abandoned since July, 1897, and meetings of the stockholders substituted in December of that year, and in February, 1898, and Mr. Glenn, representing the trust company, which was guardian for the complainant, having appeared and taken an interest in the company's affairs, it seems to us that the scrupulous care which the defendant Marr owed to his *cestui que trust* required, under the circumstances, that at least the trust company, or Mr. Glenn, should have been notified when steps were actually taken to put the defendant's claim into judgment and sell the property thereunder. It is true Mr. Glenn testifies that, with the information he had at his command, he would not have felt warranted in expending the complainant's money in protecting the property at the sale. But if he had been informed that there was an equity in the property worth as much as $12,500, it is not to be presumed that he would have omitted reasonable efforts to secure competition in bidding at the sale.

The general notice given by defendant Marr at the meetings of December and February, that unless something was done about his claims he would have to press them—the notice given hardly amounted even to a threat—did not, we think, dispense in fairness with the more specific notice that might, and, in our view, ought to have been given when steps were actually imminent to sell the property of the company for the payment of his claim.

The property of the company, having an admitted value of $25,000, and its total indebtedness being only half that amount (all held by the defendant Marr), it would seem that a sacrifice of the property might have been prevented by the expedient of a mortgage loan. Yet, so far as appears, this was not attempted, nor even suggested. Nor was any statement of the assets of the company, or of their value, submitted by the defendant, either to the directors or to the stockholders.

It thus clearly appears that the defendant Marr did not, upon bringing action against the company, openly relinquish his trust, nor give notice to the company that he had done so. If the directors were indifferent to the affairs of the company, he

should have given such notice as would have brought home to them their responsibility. At least, he could have called them in meeting and informed them of his action. If they had abandoned the duties of their office, there was all the more reason for him to give his notice to the stockholders direct.

An important and perhaps controlling circumstance is that in the outcome the property sold for only half its value. We cannot agree with the learned vice-chancellor that it is a sufficient answer to this to say that the law court from which an execution issues can set the sale aside for inadequacy of price. He cites *Palladino* v. *Hilpert, 72 N. J. Eq. (2 Buch.) 270.* In that case application was made to the court of chancery to restrain the sheriff from delivering the deed. In that juncture the application might have been made to the court out of which the execution had issued. After the delivery of the deed it is, of course, too late to do this. Where the law court sets aside a sale made under its process, it does so in the exercise of its equitable, not of its common, law powers. See *Miller* v. *Barber, 73 N. J. Law (44 Vr.) 88,* and cases cited. But these equitable powers are only incidental to the control which the court has over its own process of execution, and do not survive after the writ is fully executed. After the deed has been delivered to the purchaser, any application to set it aside for inadequacy of price must necessarily be made to the court of chancery, which court, in the exercise of its independent equitable powers, may either set aside the deed or treat the grantee as a trustee for others to the extent that he has reaped an undue profit from the transaction at their expense.

We hold that, under the circumstances disclosed by the evidence, the defendant Marr took title at the sheriff's sale subject to an option on the part of his *cestui que trust* to have the benefit of the purchase. Treating the company as a going concern, the option would have resided in it and would have had to be exercised within a reasonable time. But it is asserted by the defendant himself in his answer, and is abundantly clear from the evidence, that since the sheriff's sales the organization of the company has been abandoned. In 1902, as already observed, the

charter of the company was forfeited. As there were no other creditors, the individual stockholders were the actual *cestuis que trustent.* But none of the stockholders, other than complainant, has asked relief, and it may well be that the others are debarred from having any remedy against the defendant on the ground either of acquiescence or of laches. The present decision will therefore determine only the rights of the complainant.

Although complainant's bill was not filed until seven years after the sale, it was filed very promptly after he arrived at his majority, and laches is not attributable to him. Such notice as was given to his guardian was that already referred to, and was merely to the effect that unless the defendant Marr's claim was paid he would probably take legal proceedings. The guardian had no specific notice that legal proceedings had been commenced, nor was it placed in possession of such information concerning the value of the property as should have put it upon guard to protect the infant's interest. It is therefore unnecessary to decide whether, under other circumstances, the non-action of the guardian would bar the infant's claim in equity.

The remaining question is, just what measure of relief ought to be accorded to the complainant under the circumstances. Defendant has been in possession of the property since the sheriff's sales, and the evidence indicates that he has placed some improvements upon it; whether these have increased the value of the property, and if so to what extent, does not appear.

Under the peculiar circumstances of this case we think the complainant is entitled to an option whether he will affirm the sale to the defendant Marr and treat the latter as a trustee for the complainant to the extent that he profited by the purchase, or whether he will insist upon setting the sale aside.

If he accepts the first alternative, then upon ascertaining the difference between the market value at the time of the sheriff's sale, which was $25,000, and the amount of the claims held by the defendant Marr against the property, with interest to the time of sale, the defendant Marr should be required to pay to the complainant his share of the difference, that is, fourteen forty-eighths, or seven twenty-fourths, with interest thereon from the time of filing the bill of complaint herein.

If complainant accepts the second alternative, an account should be taken of the amount due at the time of the sheriff's sale to the defendant Marr upon his judgments, and he should be credited likewise with the present value of any betterments placed by him upon the property since his purchase, and charged with a proper rental for the property since the sheriff's sales, and with a proper amount for depreciation and damage to the personal property, if any, during his possession thereof. In this accounting interest should be allowed with proper rests.

Upon ascertaining the amount now due to defendant Marr upon such accounting, the property should be subjected to judicial sale and out of the proceeds he should be first paid the amount due to him, and out of the residue seven twenty-fourths should be paid to the complainant and the remainder to the defendant Marr.

In either case, the complainant is entitled to his costs in the court of chancery and in this court, to be paid by the defendant Marr.

Let the decree under review be reversed, and the record remitted to the court of chancery for further proceedings in accordance with the views above expressed.

*For affirmance*—None.

*For reversal*—The Chancellor, Swayze, Trenchard, Parker, Bergen, Bogert, Vredenburgh, Vroom, Green, Gray, Dill—11.